UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

UNITED STATES OF AMERICA )
)
v. ) 2:25-CR-31
) JUDGE CORKER
DENNIS DEANGELO CARTER )

## PLEA AGREEMENT PURSUANT TO RULE 11(c)(1)(C)

The United States of America, by the United States Attorney for the Eastern District of Tennessee, the defendant, DENNIS DEANGELO CARTER and the defendant's attorney, ~~LaRae Ganger~~ T. Hunter Shelton have agreed upon the following:

1. The defendant will plead guilty to the following count in the Superseding Indictment:

   a) Count One, a conspiracy to distribute 50 grams or more of methamphetamine, its salts, isomers and salts of its isomers, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A).

The punishment for this offense is as follows: a minimum of 10 years imprisonment and a maximum of life imprisonment, a maximum $10,000,000 fine, minimum 5 years and up to life on supervised release, and a $100 assessment.

2. The defendant has read the Superseding Indictment, discussed the charges and possible defenses with defense counsel, and understands the crimes charged. In order to be found guilty, the defendant agrees that each of the following elements of the crime must be proved beyond a reasonable doubt:

A. Count One:

   i. An agreement to distribute a Schedule II controlled substance;

   ii. knowledge and intent to join the conspiracy;

   iii. participation in the conspiracy, and

   iv. that the conspiracy involved 50 grams or more of methamphetamine, a Schedule II controlled substance.

3. In consideration of the defendant's guilty plea, the United States agrees to move the Court at the time of sentencing to dismiss the remaining counts against the defendant in this Superseding Indictment.

4. In support of the defendant's guilty plea, the defendant agrees and stipulates to the following facts, which satisfy the offense elements. These are the facts submitted for purposes of the defendant's guilty plea. They do not necessarily constitute all of the facts in the case. Other facts may be relevant to sentencing. Both the defendant and the United States retain the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case.

a) Multiple local and federal agencies worked together to develop suspects in a fentanyl and methamphetamine distribution conspiracy in the Eastern District of Tennessee and elsewhere. Investigators identified suspects through controlled buys, traffic stops, confidential informants, electronic surveillance and various search warrants and subpoenas. Through the investigation, the defendant was determined to be involved in the drug conspiracy.

b) From December 2024 to March 6, 2025, the defendant admits to conspiring with others to distribute methamphetamine and fentanyl in the Eastern District of Tennessee.

c) The defendant would rent various vehicles and travel to and from Michigan to supply multiple drug users and dealers in East Tennessee. For several months, the defendant supplied an unindicted coconspirator (UCC) with fentanyl. UCC supplied a confidential informant (CI) working with law enforcement.

d) On January 7, 2025, agents directed two CIs to arrange a controlled purchase of fentanyl from UCC in Kingsport, Tennessee. UCC did not arrive at the buy location, so agents directed the CIs to go to UCC's home. One of the CIs knocked on UCC's door and the defendant answered. He stated that UCC was not home, however, the defendant agreed to sell the CI the requested 1.75 grams of fentanyl. During that transaction, the defendant removed two large baggies of fentanyl from his jacket pocket and weighed out the fentanyl for the CI. The defendant wrapped it in a piece of aluminum foil and provided it to the CI in exchange for law enforcement funds. The CI then provided the fentanyl to law enforcement.

e) On January 8, 2025, the defendant contacted the CI about the prior drug sale. The defendant was upset after he gave the CI a discounted price on the fentanyl. The defendant texted the CI, "I don't do dat cutthroat shit keep it a 100 Marie my partner I don't wanna cause no confusion btw us u feel me". The CI told the defendant that they would make it right and pay the difference on the next deal.

The CI then asked how much for a full "8-ball" (3.5 grams) of fentanyl from UCC. The defendant texted the price was $450.

f) On January 9, 2025, agents directed the CIs to attempt to coordinate another controlled purchase from either the defendant or UCC. Additionally, the CIs agreed to pay a $40 difference to make up for the previous deal. The CIs drove to UCC's residence and were invited inside by UCC. The defendant was not present for this deal, however, in the recorded transaction between UCC and the CIs, UCC stated that she is the defendant's partner, stating that the defendant trusts her, and provides details about their trafficking operation. UCC sold the CIs the fentanyl and wrapped it in a piece of aluminum foil for the CIs.

g) On January 15, 2025, a CI notified agents that they spoke to the defendant on the phone. The CI recorded this phone call and provided it to agents. The nature of the conversation was the defendant telling the CI that he was on his way back home to Detroit to pick up more fentanyl. He also discussed with the CI that he was still interested in getting into the methamphetamine trafficking business.

h) On January 31, 2025, the CI recorded a phone call with the defendant. In this conversation, the defendant told the CI that they do not need to deal with UCC anymore and they can just deal with him directly going forward.

i) On February 3, 2025, agents obtained a location data search warrant to begin receiving the cell phone location for the defendant's phone. On February 4, 2025, agents located the defendant and a second car in Mount Carmel, Tennessee. The vehicles left this address, and the pair drove to Kingsport, Tennessee. On

Industry Drive, in Kingsport, the second car made an abrupt and sudden turn in the opposite direction. The defendant then continued driving to a nearby apartment building in Kingsport. The defendant went into the apartment and a short time later, he left.

j) On February 5, 2025, while agents were continuing physical surveillance the defendant contacted the CI. The message read, "Wat up its Nate I'm here n I got everything." Agents directed the CI to coordinate a controlled purchase of three ounces of methamphetamine from the defendant. While preparing for this controlled purchase, the defendant's location moved back to the area of Mount Carmel.

k) Still on February 5, 2025, agents met with the CI. In the presence of agents, the CI spoke with the defendant on the phone. The defendant agreed to the price of $1000 for 3 ounces of methamphetamine. CARTER also offered to "front" the CI another ounce and the CI would owe an additional $400 for it later. The defendant told the CI to come to and pick him up. The CI was outfitted with two audio/video recording devices and $1000 in US Currency. The CI drove to the address, the defendant exited the trailer and got into the passenger seat of the CI's vehicle. The CI paid the defendant, and the defendant told the CI that the methamphetamine was on the back passenger side tire of his car in a bag. The defendant and the CI got out of the vehicle and the CI retrieved a yellow Dollar General grocery bag containing the methamphetamine and left the residence. The methamphetamine weighed approximately 116 grams with packaging.

l) On February 9, 2025, The defendant asked the CI if they were ready for him to come back yet.

m) On February 15, 2025, agents observed the defendant's cell phone location to be traveling south on I-75 away from Detroit to the area of Maryville, Tennessee, more specifically, near Tyson McGee Airport. Agents later located a white Chevrolet Malibu that had out of state registration. As the vehicle traveled, so did the defendant's incoming location data. Agents followed this vehicle to UCC's residence in Sullivan County. The vehicle drove to several other locates in Sullivan County and then drove back to Detroit overnight.

n) On February 17, 2025, the defendant's location data once again began traveling away from Detroit, southbound on I-75 towards Tennessee. Agents located the same white Chevrolet entering Sullivan County on Interstate 81. They observed the defendant go to various locations, including using the ATM inside the gas station. The defendant retrieved money from the ATM and appeared to give an unidentified male the money he retrieved. Then, the two exchanged vehicles.

o) On February 18, 2025, agents met with the CI to arrange a controlled purchase of methamphetamine from the defendant. The CI spoke with the defendant who agreed to the price of $325 per ounce of methamphetamine. The defendant asked the CI to pay their debt of $400 from the prior deal. The defendant then told the CI to come to the same trailer in Mount Carmel. The CI was outfitted with several audio/video recording devices and $1700 in US Currency. The CI drove to the above address and called the defendant. The defendant directed the

CI to come to the front door of the trailer. The defendant and the CI exchanged the $1700 for two large baggies containing methamphetamine. During the purchase, the defendant offered the CI a sample of fentanyl to take for free. The CI took the baggie of fentanyl, and the two baggies of methamphetamine of 112 grams and left the residence.

p) On February 24, 2025, the defendant's location was still in the Mount Carmel area, the location data began traveling away from the trailer and in the direction of Kingsport. The defendant was located at the rental car return parking lot of the Tri-Cities Airport. The defendant got into a new rental and drove to the nearby Dollar General located in Blountville, Tennessee. Agents watched the defendant enter the store for several minutes, then left empty-handed. The defendant then sat in his vehicle for approximately 30 minutes before re-entering the store. This time, agents followed the defendant and watched him remove a large stack of cash, believed to be more than $2000, from his pocket. The defendant paid the cashier several hundred dollars but did not appear to have purchased any merchandise. An agent followed in line behind the defendant, after he left the store, and spoke with the cashier. The agent commented about why a person would be paying hundreds of dollars for nothing, and the cashier responded that the defendant is frequently in this store putting money into his Cash App account. The cashier voluntarily told the agent that the defendant just paid $300 twice, for a total of $600 into his Cash App.

q) Agents were able to identify two separate Cash App accounts using the defendant's past cell phone number.

r) On February 27, 2025, the defendant's location returned to Detroit. On February 28, he reported to his United States Probation Officer in Detroit as scheduled. After the meeting, the defendant began driving South again. The following day, on March 1, 2025, he returned to the same trailer in Mount Carmel, Tennessee.

s) On March 5, 2025, Agents directed a CI to contact the defendant and ask when he would be back in town because they needed more methamphetamine. The defendant responded to the CI, "I'm already here" and confirmed that the CI was going to buy another four ounces of methamphetamine.

t) Agents obtained a search warrant for the trailer in Mount Carmel, Tennessee. On March 6, 2025, the defendant's cell phone location left the trailer and went to the area of Johnson City, Tennessee. Physical surveillance was conducted, and the defendant's rental vehicle was in Johnson City, Tennessee. Later The defendant informed the CI that he would be back at his trailer in Mount Carmel in about an hour. After the defendant backed into the driveway of the trailer, the search warrant was executed. The defendant was detained in the driveway.

u) The following is the findings from the search:

    a. In the back bedroom, known to agents as the defendant's bedroom, was a loaded 9mm Jennings Model 9 pistol, a large baggie containing approximately 24 grams (including packaging) of a brown powder

substance believed to be fentanyl, a digital scale with white residue, a digital scale with packaging materials, and a pill press.

b. On the defendant's person, were three cell phones, a wallet with his identification cards, banking cards, and a CashApp card bearing his username, and a large stack of US Currency amounting to $3715. The cash was organized by largest to smallest denominations and was wrapped in a rubber band.

v) The defendant now admits that he possessed a firearm for the purpose of protecting his drug distribution, specifically on March 6, 2025, he possessed the above-named firearm in furtherance of the distribution of methamphetamine and fentanyl.

5. The defendant is pleading guilty because the defendant is in fact guilty. The defendant understands that, by pleading guilty, the defendant is giving up several rights, including:

    a) the right to plead not guilty;

    b) the right to a speedy and public trial by jury;

    c) the right to assistance of counsel at trial;

    d) the right to be presumed innocent and to have the burden of proof placed on the United States to prove the defendant guilty beyond a reasonable doubt;

    e) the right to confront and cross-examine witnesses against the defendant;

f) the right to testify on one's own behalf, to present evidence in opposition to the charges, and to compel the attendance of witnesses; and

g) the right not to testify and to have that choice not used against the defendant.

6. Pursuant to Rule 11(c)(1)(C), the defendant and the United States agree that a sentencing within the sentencing range of 140 to 175 months followed ~~but~~ a 5-year term of supervised release is the appropriate disposition of this case. Additionally, Court may impose any lawful fine(s) and any special assessment fees as required by law, and order forfeiture as applicable and restitution as appropriate. Further pursuant to Rule 11(c)(1)(C), and in consideration of the terms of this plea agreement, the United States and the defendant stipulate and agree to the following Sentencing Guideline provisions, policies and/or factors:

[handwritten annotation: "buy THS"]

i. The offense conduct does support the Specific Offense Characteristic § 2D1.1(b)(1), the defendant possessed a dangerous weapon.

ii. The offense conduct does **not** support the Specific Offense Characteristic § 2D1.1(b)(12), the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance.

iii. The offense conduct does **not** support the Aggravating Role in the Offense § 3B1.1(a)-(c), the defendant was an organizer, leader, manager or supervisor in any criminal activity.

iv. The defendant admits that the defendant conspired to distribute and is accountable for at least 50 grams but less than 150 grams of actual methamphetamine.

The defendant understands and agrees that the recommendations set forth in this paragraph are made pursuant to Rule 11(c)(1)(C) and as such are binding on the Court once the Court accepts the plea agreement. In the event the Court declines to accept this agreement, either party will be free to withdraw from the plea agreement.

8. Given the defendant's agreement to plead guilty, the United States will not oppose a two-level reduction for acceptance of responsibility under the provisions of Section 3E1.1(a) of the Sentencing Guidelines. Further, if the defendant's offense level is 16 or greater, and the defendant is awarded the two-level reduction pursuant to Section 3E1.1(a), the United States agrees to move, at or before the time of sentencing, the Court to decrease the offense level by one additional level pursuant to Section 3E1.1(b) of the Sentencing Guidelines. Should the defendant engage in any conduct or make any statements that are inconsistent with accepting responsibility for the defendant's offense(s), including violations of conditions of release or the commission of any additional offense(s) prior to sentencing, the United States will be free to decline to make such motion, to withdraw that motion if already made, and to recommend to the Court that the defendant not receive any reduction for acceptance of responsibility under Section 3E1.1 of the Sentencing Guidelines.

9. The defendant agrees to pay the special assessment in this case prior to sentencing.

10. Unless otherwise limited by an agreed preliminary order of forfeiture, the defendant agrees to forfeit to the United States immediately and voluntarily his interest in any and all assets and property, or portions thereof, which are in the possession or control of the defendant or the defendant's nominees that constitutes or is derived from, any proceeds obtained, directly or indirectly, as a result of the offense and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the offense in violation of 21 U.S.C. §§ 846 and/or 841. Defendant agrees to forfeit the following:

### FIREARM

a) 9mm Jennings Model 9 pistol

### MONEY JUDGMENT

A personal money judgment in the amount of at least $3,975.00 against the defendant, which DENNIS DEANGELO CARTER, which represents the proceeds that the defendant personally obtained as a result of an offense in violation of 21 U.S.C. §§ 846 and/or 841.

The defendant further agrees to assist the United States fully in the identification, recovery, and return to the United States of any other assets or portions thereof subject to forfeiture. The defendant further agrees to make a full and complete disclosure of all assets over which the defendant exercises control and those which are held or controlled by a nominee. The defendant agrees to forfeit all interests in the properties and to take whatever steps are necessary to pass clear title to the United States. These steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and the signing of any other documents necessary to effectuate such transfers. The defendant agrees not to object to any administrative,

civil or criminal forfeiture brought against any property seized or in custody of law enforcement during the investigation. The defendant agrees to take all such steps to locate such property and to pass title to the United States before the defendant's sentencing.

In the event a money judgment forfeiture is ordered, the defendant agrees to send all money judgment payments to the United States Marshals Service. Defendant also agrees that the full money judgment amount shall be considered due and payable immediately. If the defendant cannot pay the full amount immediately and is placed in custody, the defendant agrees that the Bureau of Prisons will have the authority to establish payment schedules to ensure payment of the money judgment. The defendant further agrees to cooperate fully in efforts to collect on the money judgment by set-off of federal payments, execution on non-exempt property, and any other means the United States deems appropriate. The defendant and counsel also agree that the defendant may be contacted post-judgment regarding the collection of the money judgment without notifying defendant's counsel and outside the presence of the defendant's counsel.

11. Financial Obligations. The defendant agrees to pay all fines and restitution imposed by the Court to the Clerk of Court. The defendant also agrees that the full fine and/or restitution amount(s) shall be considered due and payable immediately. If the defendant cannot pay the full amount immediately and is placed in custody or under the supervision of the Probation Office at any time, the defendant agrees that the Bureau of Prisons and the Probation Office will have the authority to

establish payment schedules to ensure payment of the fine and/or restitution. The defendant further agrees to cooperate fully in efforts to collect any financial obligation imposed by the Court by set-off of federal payments, execution on non-exempt property, and any other means the United States deems appropriate. The defendant and counsel also agree that the defendant may be contacted post-judgment regarding the collection of any financial obligation imposed by the Court without notifying the defendant's counsel and outside the presence of the defendant's counsel. In order to facilitate the collection of financial obligations to be imposed with this prosecution, the defendant agrees to disclose fully all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party. In furtherance of this agreement, the defendant additionally agrees to the following specific terms and conditions:

a) If so requested by the United States, the defendant will promptly submit a completed financial statement to the U.S. Attorney's Office, in a form it provides and as it directs. The defendant promises that such financial statement and disclosures will be complete, accurate, and truthful.

b) The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

c) If so requested by the United States, the defendant will promptly execute authorizations on forms provided by the U.S. Attorney's Office to permit the U.S. Attorney's Office to obtain financial and tax records of the defendant.

12. The defendant voluntarily, knowingly, and intentionally agrees to the following:

   a) The defendant will not file a motion for downward departure or variance or a direct appeal of the defendant's conviction(s) or sentence with one exception: The defendant retains the right to appeal a sentence imposed above the sentencing guideline range determined by the Court or above any mandatory minimum sentence deemed applicable by the Court, whichever is greater. The defendant also waives the right to appeal the Court's determination as to whether the defendant's sentence will be consecutive or partially concurrent to any other sentence.

   b) The defendant will not file any motions or pleadings pursuant to 28 U.S.C. § 2255 or otherwise collaterally attack the defendant's conviction(s) or sentence, with two exceptions: The defendant retains the right to file a § 2255 motion as to (i) prosecutorial misconduct and (ii) ineffective assistance of counsel.

   c) The defendant will not, whether directly or by a representative, request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. Section 552, or the Privacy Act of 1974, 5 U.S.C. Section 552a.

13. The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the defendant is pleading guilty. Removal and other

immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including his attorney or the Court, can predict to a certainty the effect of the defendant's conviction on immigration status. The defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences the plea may entail, even if the consequence is automatic removal from the United States.

14. This plea agreement becomes effective once it is signed by the parties and is not contingent on the defendant's entry of a guilty plea. If the United States violates the terms of this plea agreement, the defendant will have the right to withdraw from this agreement. If the defendant violates the terms of this plea agreement in any way (including but not limited to failing to enter guilty plea(s) as agreed herein, moving to withdraw guilty plea(s) after entry, or by violating any court order or any local, state or federal law pending the resolution of this case), then the United States will have the right to void any or all parts of the agreement and may also enforce whatever parts of the agreement it chooses. In addition, the United States may prosecute the defendant for any and all federal crimes that the defendant committed related to this case, including any charges that were dismissed and any other charges which the United States agreed not to pursue. The defendant expressly waives any statute of limitations defense and any constitutional or speedy trial or double jeopardy defense to such a prosecution. The defendant also understands that a violation of this plea agreement by the defendant does not entitle the defendant to withdraw the defendant's guilty plea(s) in this case.

15. The United States will file a supplement in this case, as required in every case by the Local Rules of the United States District Court for the Eastern District of Tennessee, even though there may or may not be any additional terms. If additional terms are included in the supplement, they are hereby fully incorporated herein.

16. This plea agreement and supplement constitute the full and complete agreement and understanding between the parties concerning the defendant's guilty plea to the above-referenced charge(s), and there are no other agreements, promises, undertakings, or understandings between the defendant and the United States. The parties understand and agree that the terms of this plea agreement can be modified only in writing signed by all of the parties and that any and all other promises, representations, and statements whether made before, contemporaneous with, or after this agreement, are null and void.

FRANCIS M. HAMILTON III
UNITED STATES ATTORNEY

10/3/25
Date

By: _____
MEGHAN L. GOMEZ
Assistant United States Attorney

9-19-25
Date

DENNIS DEANGELO CARTER
Defendant

9-19-25
Date

~~LARAE GANGER~~ T Hunter Shelton
Attorney for the Defendant